MARTIN A. MUCKLEROY, ESQ.
Nevada Bar No. 009634
MUCKLEROY LUNT, LLC
6077 S. Fort Apache, Ste 140
Las Vegas, NV 89148
Phone: (702) 907-0097
Direct: (702) 534-6272
Fax: (702) 938-4065
martin@muckleroylunt.com

*Attorneys for Plaintiff*

(Additional Counsel on Signature Page)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| MARK CSABA, derivatively on behalf of SPECTRUM PHARMACEUTICALS, INC., | Case No. |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| JOSEPH W. TURGEON, KURT A. GUSTAFSON, FRANCOIS LEBEL, WILLIAM L. ASHTON, NORA E. BRENNAN, SETH H.Z. FISCHER, JEFFREY L. VACIRCA, DOLATRAI M. VYAS, BERNICE R. WELLES, STUART KRASSNER, RAYMOND W. COHEN, GILLES R. GAGNON, ANTHONY E. MAIDA, AND ELIZABETH A. CZEREPAK, | |
| Defendants, | |
| and | |
| SPECTRUM PHARMACEUTICALS, INC., | |
| Nominal Defendant. | |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Mark Csaba ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Spectrum Pharmaceuticals, Inc. ("Spectrum" or the "Company"), files this Verified Stockholder Derivative Complaint against Defendants Joseph W. Turgeon ("Turgeon"), Kurt A. Gustafson ("Gustafson"), Francois Lebel ("Lebel"), William L. Ashton ("Ashton"), Nora E. Brennan ("Brannan"), Seth H.Z. Fischer ("Fischer"), Jeffrey L. Vacirca ("Vacirca"), Dolatrai M. Vyas ("Vyas"), Bernice R. Welles ("Welles"), Stuart Krassner ("Krassner"), Raymond W. Cohen ("Cohen"), Gilles R. Gagnon ("Gagnon"), Anthony E. Maida ("Maida"), and Elizabeth A. Czerepak ("Czerezpak") (collectively, the "Individual Defendants," and together with Spectrum, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Spectrum, unjust enrichment, and for violations of Sections 10(b), 21D, and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Spectrum, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a stockholder derivative complaint brought in the right, and for the benefit, of Spectrum against certain of its officers and/or directors seeking to remedy the Individual Defendants' wrongdoings committed from December 27, 2018 through August 5, 2021, both dates inclusive (the "Relevant Period").

2.      Spectrum is a biopharmaceutical company, with a primary focus comprised of acquiring, developing, and commercializing novel and targeted oncology therapies. The

Company's in-house development organization includes clinical development, regulatory, quality, and data management.

3.      The Company has three drugs in development: (1) ROLONTIS, a purportedly novel long-acting granulocyte colony-stimulating factor ("G-CSF") for chemotherapy-induced neutropenia; (2) Poziotinib, a purportedly novel irreversible tyrosine kinase inhibitor under investigation for non-small cell lung cancer ("NSCLC") tumors with various mutations; and (3) Anti-CD-20-IFNα, a purported antibody-interferon fusion molecule directed against CD20, a protein found on a type of white blood cell, which is found in higher-than-normal amounts in patients with certain types of lymphomas and leukemias.

4.      In December 2018, Spectrum submitted a Biologics License Application ("BLA") to the U.S. Food and Drug Administration ("FDA") for ROLONTIS as a treatment for chemotherapy-induced neutropenia (the "ROLONTIS BLA"). The Individual Defendants touted that the submission of the ROLONTIS BLA as a "milestone [that brought the Company] one step closer to bringing the first novel G-CSF to healthcare providers in over 15 years in a large market." The Individual Defendants also touted that the ROLONTIS BLA "was supported by data from two identically designed Phase 3 clinical trials."

5.      During the Relevant Period, each of the Individual Defendants had actual or constructive knowledge that violated their duty of good faith by knowingly causing and/or recklessly allowing the Company to make false and misleading statements and/or fail to disclose that: (i) the ROLONTIS manufacturing facility maintained deficient controls and/or procedures; (ii) the foregoing deficiencies decreased the likelihood that the FDA would approve the ROLONTIS BLA in its current form; (iii) Spectrum had therefore materially overstated the ROLONTIS BLA's approval prospects; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.      The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

7.      Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

8.      Furthermore, during the Relevant Period, defendant Heyward breached his fiduciary duties by making a lucrative insider sale, obtaining proceeds of over $1.3 million.

9.      In light of the Individual Defendants' misconduct, which has subjected Spectrum and its President and Chief Executive Officer ("CEO"), Turgeon; Executive Vice President and Chief Financial Officer ("CFO"), Gustafson; and Chief Medical Officer ("CMO"), Lebel to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of Nevada (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses due to the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the  Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

10.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's, CFO's, and CMO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Spectrum's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## **JURISDICTION AND VENUE**

11.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim arising under the federal securities laws.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

13.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either headquartered in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction  over them.

15.     Venue is proper in this District because Spectrum is headquartered in this District, the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

### PARTIES

#### Plaintiff

16.     Plaintiff Mark Csaba is a current holder of Spectrum common stock and has continuously held Spectrum common stock since December 2017.

#### Nominal Defendant Spectrum

17.     Nominal Defendant Spectrum is a Delaware corporation with its principal executive office located at 11500 S. Eastern Ave., Suite 240, Henderson, NV 89052. Spectrum's shares trade on the NASDAQ under the ticker symbol SPPI.

#### The Individual Defendants

18.     Defendant Turgeon has served as Spectrum's President and CEO since December 2017. Turgeon also served as the Company's Chief Operating Officer ("COO") from April 2014 to December 2017, and from October 2012 to April 2014, he served as the Company's Senior Vice President ("SVP") and Chief Commercial Officer ("CCO"). Turgeon also served as a director of the Company's Board since December 2017. According to the Company's public filings, Turgeon received the following amount of compensation from the Company during the Relevant Period:

|      | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|------------------------|-------|
| 2020 | $750,000 | $525,000 | $675,001 | $1,618,441 | $144,776 | $3,713,218 |
| 2019 | $750,000 | $498,750 | $3,001,500 | $1,299,032 | $147,950 | $5,697,232 |

19.     Defendant Gustafson has served as Spectrum's EVP and CFO since June 2013. According to the Company's public filings, Gustafson received the following amount of compensation from the Company during the Relevant Period:

|      | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|------------------------|-------|
| 2020 | $540,000 | $270,000 | $390,000 | $747,566 | $143,386 | $2,090,952 |
| 2019 | $540,000 | $256,500 | $1,600,800 | $584,564 | $140,956 | $3,122,820 |

20.     Defendant Lebel has served as Spectrum's EVP and CMO since November 2018. According to the Company's public filings, Lebel received the following amount of compensation from the Company during the Relevant Period:

|      | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|------------------------|-------|
| 2020 | $540,000 | $270,000 | $450,001 | $847,754 | $116,763 | $2,224,518 |
| 2019 | $520,000 | $247,000 | $1,178,073 | $634,661 | $87,039 | $2,666,773 |

21.     Defendant Ashton has served as a director of the Company's Board since February 2018 and as Chairman of the Board since June 2019. During the Relevant Period, Ashton served on the Board's Audit Committee and Nominating & Corporate Governance Committee ("N&CG Committee"). According to the Company's public filings, Ashton received the following amount of compensation from the Company during the Relevant Period:

|      | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|------------------------|-------|
| 2020 | $115,000 | | $88,200 | $111,967 | | $315,167 |
| 2019 | $95,000 | | $84,400 | $92,715 | | $272,115 |

22.     Defendant Brennan has served as a director of the Company's Board since December 2020. During the Relevant Period, Brennan served as Chairperson of the Audit Committee. According to the Company's public filings, Brennan received the following amount of compensation from the Company during the Relevant Period:

|      | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|------------------------|-------|

5

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2020 | $47,500 | | $70,350 | $93,256 | | $211,106 |

23.     Defendant Fischer has served as a director of the Company's Board since April 2020. During the Relevant Period, defendant Fischer served on the Audit Committee and the Compensation Committee. According to the Company's public filings, Fischer received the following amount of compensation from the Company during the Relevant Period:

| | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2020 | $56,667 | | $88,200 | $121,015 | | $265,882 |

24.     Defendant Vacirca has served as a director of the Company's Board since November 2018. During the Relevant Period, Vacirca served on the Compensation Committee and the Science, Technology & Sustainability Committee ("ST&S Committee"). According to the Company's public filings, Vacirca received the following amount of compensation from the Company during the Relevant Period:

| | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2020 | $101,667 | | $88,200 | $111,967 | | $301,834 |
| 2019 | $85,000 | | $84,400 | $92,715 | | $262,115 |

25.     Defendant Vyas has been a director of the Company's Board since June 2013. During the Relevant Period, Vyas served on the N&CG Committee and the ST&S Committee. According to the Company's public filings, Vyas received the following amount of compensation from the Company during the Relevant Period:

| | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2020 | $90,000 | | $88,200 | $111,967 | | $290,167 |
| 2019 | $80,000 | | $84,500 | $92,715 | | $257,115 |

26.     Defendant Welles has been a director of the Company's Board since June 2018. During the Relevant Period, Welles served on the N&CG Committee and the ST&S Committee.

According to the Company's public filings, Welles received the following amount of compensation from the Company during the Relevant Period:

| | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2020 | $100,000 | | $88,200 | $111,967 | | $300,167 |
| 2019 | $90,000 | | $84,400 | $92,715 | | $267,115 |

27.  Defendant Krassner served on the Company's Board between 2004 and June 2019. During the Relevant Period, Krassner served on the Audit Committee. According to the Company's public filings, Krassner received the following amount of compensation from the Company during the Relevant Period:

| | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2019 | $57,500 | | | | | $57,500 |

28.  Defendant Cohen served on the Company's Board between June 2013 and April 2020. During the Relevant Period, Cohen served on the Audit Committee, the Compensation Committee, and the N&CG Committee. According to the Company's public filings, Cohen received the following amount of compensation from the Company during the Relevant Period:

| | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2020 | $47,500 | | | | | $47,500 |
| 2019 | $100,000 | | $84,400 | $92,715 | | $277,115 |

29.  Defendant Gagnon served on the Company's Board between March 2012 and June 2019. According to the Company's public filings, Gagnon received the following amount of compensation from the Company during the Relevant Period:

| | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2019 | $32,500 | | | | | $32,500 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

30.     Defendant Maida served on the Company's Board between December 2003 and June 2019. During the Relevant Period, Maida served on the Audit Committee. According to the Company's public filings, Maida received the following amount of compensation from the Company during the Relevant Period:

|      | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|------------------------|-------|
| 2019 | $47,500 |      |              |               |                        | $47,500 |

31.     Defendant Czerepak served on the Company's Board between June 2019 and December 2020. According to the Company's public filings, Czerepak received the following amount of compensation from the Company during the Relevant Period:

|      | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|------------------------|-------|
| 2020 | $100,000 |     | $88,200      | $111,967      |                        | $300,167 |
| 2019 | $47,500 |      | $84,400      | $92,715       |                        | $224,615 |

32.     Defendants Turgeon, Gustafson, and Lebel are collectively referred to herein as the "Officer Defendants."

33.     Defendants Ashton, Brennan, Fischer, Turgeon, Vacirca, Vyas, and Welles are collectively referred to herein as the "Demand Director Defendants."

34.     Defendants Ashton, Brennan, Fisher, Cohen, Krassner, and Maida are collectively referred to herein as the "Audit Committee Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

35.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its stockholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

36.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

37.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information.

38.    To discharge their duties, the officers and directors of Spectrum were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Spectrum were required to, among other things:

a.    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.    conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's

9
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

stock;

c.   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.   remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.   ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

39.   Each of the Individual Defendants, as an executive officer and/or director, owed to the Company and to its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

40.   According to the Company's Corporate Governance Guidelines, the Board members are required to "to exercise its powers in accordance with its fiduciary duties to the Company and act in a manner it reasonably believes to be in the best interests of the Company and its stockholders."

41.   The Company also maintains a Code of Business Conduct and Ethics (the "Code of Conduct"). The Code of Conduct sets forth legal and ethical standards of conduct for directors, officers, employees, and consultants of Spectrum and its subsidiaries.

42. According to the Code of Conduct, the employees and directors of Spectrum are responsible for helping Spectrum maintain its good reputation and the trust and confidence of its stockholders, its employees, the public, and those with whom Spectrum does business.

43. Pursuant to the Code of Conduct:

**Accurate Record Keeping**

All official Company records must be complete and reliable in all material respects. Company records can include sales and booking information, payroll, timecards, travel and expense reports, accounting and financial data, measurement and performance records, and other official records maintained in the ordinary course of our business. Undisclosed or unrecorded Company transactions, payments or receipts are inconsistent with our business practices and are prohibited. In addition, certain Company records must be retained as required by law, rule or regulation. The Company maintains document retention practices that each employee, as applicable, must follow with respect to Company records within such employee's control.

**Accuracy of Financial Reports And Other Public Communications**

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the prompt disclosure of accurate and complete material information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting of such information will not be tolerated and can severely damage the Company and cause legal liability. The Company's principal financial officers and other employees working in the accounting function have a special responsibility to ensure that all of our financial disclosures are complete, fair, accurate, timely and understandable. These employees must strive to ensure the Company's financial reporting complies with generally accepted accounting principles and all applicable standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

44. In addition, the Company's Audit Committee is specifically tasked with the Board's oversight responsibilities. The conduct of the Audit Committee is governed by the Audit Committee Charter (the "Charter").

45. Pursuant to the Charter:

**The Purpose of the Audit Committee**

The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Spectrum Pharmaceuticals, Inc. (the "Company") is to represent and assist the Board in its general oversight of the Company's accounting and financial reporting processes, audits of the financial statements, internal control and audit functions, and compliance with legal and regulatory requirements. The Company's management is responsible for establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing the Company's financial statements. The Company's independent

auditor is a registered public accounting firm (the "independent auditor"), and is responsible for performing an independent audit of and rendering an opinion on the financial statements of the Company in accordance with GAAP at each fiscal year end and performing quarterly reviews of such financial statements. The Committee is responsible for the appointment, compensation, retention and oversight of the work of the independent auditor for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, and the independent auditor reports directly to the Committee.

\*       \*       \*

**Primary Responsibilities**

The Committee shall:

- have the sole authority and is directly responsible for the appointment, compensation, retention, termination, replacement, evaluation and oversight of the work of the independent auditor and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company. The independent auditor and any such other registered public accounting firm shall report directly to the Committee. The Committee's authority includes resolution of disagreements between management and the independent auditor regarding financial reporting and the receipt of communications from the independent auditors as may be required under professional standards applicable to such auditors;

- ensure that the independent auditor prepares and delivers, at least annually, a written statement delineating all relationships between the independent auditor and the Company, actively engage in a dialogue with the independent auditor with respect to any disclosed relationships or services that may impact the objectivity and independence of the independent auditor and take, or recommend that the Board take, appropriate action to oversee the independence of the outside auditor;

- obtain and review a report by the Company's independent auditors that describes (a) the accounting firm's internal quality control procedures, and (b) any issues raised by the most recent internal quality control review, peer review or Public Company Accounting Oversight Board (the "PCAOB") review or inspection of the firm or by any other inquiry or investigation by governmental or professional authorities in the past five years regarding one or more audits carried out by the firm and any steps taken to deal with any such issues;

- review and discuss the Company's overall audit plan (both internal and external), including the proposed scope, plan, results, budget and staffing, with the independent auditor, management and any internal audit function that is responsible for preparing the Company's financial statements, and approve the independent auditor's annual audit plan;

- pre-approve all audit and permissible non-audit services provided to the Company by the independent auditor or other registered public accounting firms, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules, and assess the impact of any permitted non-audit services on the independence of the auditor. The

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Committee may, in its sole discretion, but subject to SEC and NASDAQ rules and regulations, establish written policies and procedures for the preapproval of audit and non-audit service engagement arrangements, provided the policies are detailed as to the particular service, the Committee is informed of each service and the policies do not delegate the Committee's responsibilities to management, if any;

- periodically review and discuss with the independent auditor matters required to be discussed under the standards of the PCAOB, including, but not limited to: (a) the matters required to be discussed pursuant to existing professional standards (including the PCAOB's Auditing Standard No. 16, Communications with Audit Committees, as it may be modified or supplemented); (b) any formal written statements received from the independent auditor consistent with and in satisfaction of the PCAOB's Ethics and Independence Rule 3526, Communication with Audit Committees Concerning Independence, as amended, including without limitation, descriptions of (x) all relationships between the independent auditor and the Company, (y) any disclosed relationships or services that may impact the independent auditor's objectivity and independence and (z) whether any of the Company's senior finance personnel were recently employed by the independent auditor; and (c) certain matters related to the conduct of the audit, while providing information to the independent auditor relevant to the audit, including, among other items, matters related to certain accounting policies and practices, estimates and significant unusual transactions, consistent with PCAOB's Auditing Standard No. 1301, Communications with Audit Committees, as it may be modified or supplemented;

- review the experience, qualifications and performance of the independent auditor's senior personnel that are providing audit services to the Company;

- review and discuss reports from the independent auditor on (a) all critical accounting policies and practices used by the Company, (b) alternative accounting treatments within GAAP related to material items that have been discussed with management, including the ramifications of the use of the alternative treatments and the treatment preferred by the independent auditor, and (c) other material written communications between the independent auditor and management;

- review and discuss with management and the independent auditor (a) unaudited interim financial information including the related notes, (b) audited annual financial information including the related notes, (c) the form of audit opinion to be issued by the independent auditor on the audited annual financial statements, and (d) "Management's Discussion and Analysis of Financial Condition and Results of Operations," and determine whether to recommend to the Board that the audited annual financial statements be included in the Company's Annual Report on Form 10-K each year;

- review and discuss with management and the independent auditor: (a) the adequacy and effectiveness of the Company's internal controls (including any significant deficiencies or material weaknesses) and significant changes in internal controls reported to the Committee by the independent auditor or management; (b) the Company's internal audit procedures; (c) the adequacy and effectiveness of the Company's disclosure controls and procedures, and management reports thereon; and (d) disclosure relating to the Company's

13
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

internal controls to be included in filings with the SEC;

- review and discuss with management and the independent auditor: (a) any major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection and application of accounting principles; (b) any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including the effects of alternative GAAP methods; and (c) the effect of regulatory and accounting initiatives and off-balance sheet structures on the Company's financial statements;

- review and discuss with management and the independent auditor various topics and events that may have a significant financial impact on the Company or that are the subject of discussions between management and the independent auditor;

- review risks relating to financial statements, the auditing and financial reporting process, and key credit risks, liquidity risks and market risks and inquire of management, the members of the internal audit function and the independent auditor about the Company's major financial and auditing risks or exposures. The Committee shall discuss with management and, as appropriate, the internal audit function and/or independent auditor, the Company's risk management and risk assessment guidelines and policies relating to the Company's accounting and financial risk exposures and the steps management has taken to monitor and control such exposures. The Committee shall report the results to the Board;

- obtain from the independent auditor assurances that the independent auditor has provided all notices of illegal acts as required by Section 10A(b) of the Securities Exchange Act of 1934, as amended;

- discuss with attorneys any legal matters that might have a material impact on the financial statements;

- ensure that the independent auditor completes its audit partner rotation in conformance with applicable law;

- review and discuss with management published financial information and whether and to what extent earnings guidance and similar information shall be disclosed publicly by the Company. This may be conducted generally as to types of information and presentations and need not include advance review of each publication or disclosure;

- review, approve and oversee any related-party transactions (as defined in the applicable SEC rules and regulations, including Item 404 of Regulation S-K) and any other potential conflict of interest situations on an ongoing basis, in accordance with the Company's policies and procedures, including the Company's written policy for approval or ratification of such transactions, and develop policies and procedures for the Committee's approval of related-party transactions, including any transactions which may be pre-approved by the Committee;

- establish and monitor procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

auditing matters. The Committee shall review any such complaints and submissions that have been received, including the current status and the resolution if one has been reached;

- review and approve on a periodic basis, as appropriate, the Company's investment policy;

- prepare the report of the Committee required by and in accordance with the rules, regulations and guidance of the SEC to be included in the Company's annual proxy statement;

- review and discuss with the Company's management and the independent auditor the reliability of the Company's forward-looking statements contained in quarterly and annual reports, proxy statements and earnings press releases disseminated by the Company;

- review and discuss with the Company's management and the independent auditor any off-balance sheet transactions or structures and their effect on the Company's financial results and operations, as well as the disclosure regarding such transactions and structures in the Company's public filings;

- review with the Company's Chief Executive Officer and Chief Financial Officer the Committee's disclosure recommendations, if any, prior to the filing or distribution of any final draft Form 10-Q or Form 10-K, as applicable;

- receive prompt quarter-end updates regarding the Company's financial performance as compared to the Company's published financial guidance, if applicable, which updates shall include recommendations by senior management regarding whether the Company should revise its published guidance, if any, or release preliminary financial results;

- at least annually, review with the Company's Chief Executive Officer, Chief Financial Officer and independent auditor, the Company's policies related to its methods and adequacy of its internal controls over financial reporting and the existing internal controls over financial reporting at the Company, including any actual or desirable changes to the Company's internal financial reporting controls or policies related to revenue recognition or the development of financial guidance; and

- at least quarterly and more often, if appropriate, the Chairperson of the Committee will report any concerns regarding disclosure issues to the Board, if any.

46.     In violation of the Charter, and their general duties as members of the Audit Committee, the Audit Committee Defendants conducted little, if any, oversight of the Company's internal controls or the Company's compliance with legal and regulatory requirements, resulting in materially false and misleading statements regarding the Company's business, operational, and compliance policies, and consciously disregarded their duties to monitor such controls over reporting. The Audit Committee Defendants' complete failure to perform their duties in good faith

15
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

resulted in false misrepresentations to the SEC, the investing public, and the Company's stockholders.

47.    Each of the Individual Defendants further owed to Spectrum and its stockholders the duty of loyalty, which requires that each favor Spectrum's interest and that of its stockholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain a personal advantage.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

48.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

49.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

50.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Spectrum was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

51.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the

commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background

52.     Spectrum is a biopharmaceutical company, with a primary focus comprised of acquiring, developing, and commercializing novel and targeted oncology therapies. The Company's in-house development organization includes clinical development, regulatory, quality, and data management.

53.     The Company has three drugs in development. First drug in development is ROLONTIS, a purportedly novel long-acting granulocyte colony-stimulating factor ("G-CSF") for chemotherapy-induced neutropenia.

54.     Second drug in development is Poziotinib, a purportedly novel irreversible tyrosine kinase inhibitor under investigation for non-small cell lung cancer ("NSCLC") tumors with various mutations.

55.     Third drug in development is Anti-CD-20-IFNα, a purported antibody-interferon fusion molecule directed against CD20, a protein found on a type of white blood cell, which is found in higher-than-normal amounts in patients with certain types of lymphomas and leukemias.

### Materially False and Misleading Statements

56.     During the Relevant Period, the Individual Defendants caused the Company to issue materially false and misleading statements, as well as failing to disclose material adverse facts about the Company's business, operations, and compliance policies.

57.     Specifically, the Individual Defendants caused the Company to make false and/or misleading statements and/or failed to disclose that: (i) the ROLONTIS manufacturing facility maintained deficient controls and/or procedures; (ii) the foregoing deficiencies decreased the likelihood that the FDA would approve the ROLONTIS BLA in its current form; (iii) Spectrum

17
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

had therefore materially overstated the ROLONTIS BLA's approval prospects; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

58.     On December 27, 2018, the Individual Defendants caused the Company to issue a press release, which stated, in relevant part:

> "ROLONTIS is an important and significant future growth driver for our company," said Joe Turgeon, President and CEO of Spectrum Pharmaceuticals. "Today's milestone brings us one step closer to bringing the first novel G-CSF to healthcare providers in over 15 years in a large market that is familiar to Spectrum."
>
> The BLA for ROLONTIS is supported by data from two identically designed Phase 3 clinical trials, ADVANCE and RECOVER, which evaluated the safety and efficacy of ROLONTIS in 643 early-stage breast cancer patients for the treatment of neutropenia due to myelosuppressive cytoxic chemotherapy. The study ADVANCE was conducted under a special protocol assessment (SPA) with the Agency. In both studies, ROLONTIS demonstrated the pre-specified hypothesis of non-inferiority (NI) in Duration of Severe Neutropenia (DSN) and a similar safety profile to pegfilgrastim. ROLONTIS also demonstrated non-inferiority to pegfilgrastim in the DSN across all 4 cycles (all NI p<0.0001) in both studies.

59.     On February 28, 2019, the Individual Defendants caused the Company to file a Form 10-K with the SEC (the "2018 10-K"), which stated, in relevant part:

> In December 2015, we reached agreement with the FDA regarding our Phase 3 Special Protocol Assessment, or SPA, for ROLONTIS. This pivotal Phase 3 study (ADVANCE Study, or SPI-GCF-301) was initiated in the first quarter of 2016 to evaluate ROLONTIS as a treatment for chemotherapy-induced neutropenia. We announced in February 2018 that the top line results of this study met the non-inferiority of ROLONTIS to pegfilgrastim endpoint in the Duration of Severe Neutropenia, or DSN, across all four cycles (all p<0.0001). We initiated a second pivotal Phase 3 study (RECOVER Study, or SPI-GCF-302) and announced in June 2018, that it had also met its primary efficacy endpoint of non-inferiority in DSN between ROLONTIS and pegfilgrastim.
>
> We submitted our Biologics License Application ("BLA") with the FDA in late December 2018. Due to the recent federal government shutdown, the BLA was officially received by the FDA on January 28, 2019. Once this BLA is accepted by the FDA, our Prescription Drug User Fee Act date is expected to be set for 10 months thereafter.

60.     The 2018 10-K was signed by defendants Turgeon, Gustafson, Krassner, Vyas, Welles, Maida, Cohen, Gagnon, Vacirca, and Ashton.

61.     The 2018 10-K also included a certification from defendants Turgeon and Gustafson pursuant to Section 302 of Sarbanes-Oxley Act of 2002 ("SOX"), which stated:

> 1. I have reviewed this Annual Report on Form 10-K of Spectrum Pharmaceuticals, Inc.;

18
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

62.    Additionally, in connection with the 2018 10-K, the Individual Defendants caused the Company to issue a press release titled "Spectrum Pharmaceuticals Reports Fourth Quarter 2018 and Full Year 2018 Financial Results and Pipeline Update," which stated:

"2018 was a very productive year for Spectrum in which our two promising pipeline products significantly progressed in clinical development," said Joe Turgeon, President and CEO of Spectrum Pharmaceuticals. "We begin 2019 with great momentum after meeting the enrollment target for the first cohort in our pivotal poziotinib study and submitting the BLA for ROLONTIS to the FDA at the end of 2018. In 2019, we are laser-focused on continuing to develop our two late-stage products, poziotinib and ROLONTIS, and looking for new opportunities that build upon these assets."

63.    Later that same day, on February 28, 2019, the Company held a conference call with investors and analysts, during which defendant Turgeon stated:

2018 was a very productive year for Spectrum and my first full year as the CEO and as I reflect on the year there are three major developments in 2018 that I'm very proud of and really defines who we are today. The most significant development in 2018 was the advancement of our pipeline assets, poziotinib and ROLONTIS. 2018 was data rich for both poziotinib and ROLONTIS and the data strengthened our confidence in both of these assets.

*        *        *

For ROLONTIS data from two Phase 3 trials demonstrated that it was non-inferior and the standard of care with a similar safety profile. We submitted a BLA with the FDA late in December 2018.

*        *        *

As we look at 2019, poziotinib and ROLONTIS will be our primary focus while we're also exploring opportunities beyond our existing pipeline.

64.    During the same call, defendant Gustafson, in response to a question regarding the Company's cash guidance, stated: "[s]o I think as we take a look at our forecast we feel great about the ROLONTIS data and the BLA filing. So our forecast does include a launch of ROLONTIS sometime in 2020 and so that that is indeed included in that guidance."

65.    On March 15, 2019, the Individual Defendants caused the Company to issue a press release announcing its voluntary withdrawal of the ROLONTIS BLA. Specifically the press release stated:

[D]ue to the [FDA's] request for additional manufacturing-related information for ROLONTIS, the company has voluntarily withdrawn [the ROLONTIS BLA]. Spectrum plans to resubmit a revised BLA as soon as possible.

20
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

The FDA did not cite concerns related to the pre-clinical and clinical modules of the BLA or the need for additional clinical studies. Spectrum's decision to withdraw the BLA was the result of the company needing more time to provide certain additional manufacturing-related information, which was required before March 29, 2019, the day that the FDA's initial 60-day review period ends.

"We are continuing to have productive discussions with the FDA and will deliver the additional information needed to support the application," said Joe Turgeon, President and CEO of Spectrum Pharmaceuticals. "We remain confident in the ROLONTIS program and look forward to a successful resubmission and its ultimate approval."

66.     On May 9, 2019, the Company held a conference call with investors and analysts, during which defendant Turgeon stated, "[w]e also continue to advance the development of our late stage assets poziotinib and ROLONTIS, the cornerstones of our Company," and "[r]egarding ROLONTIS, we continue to have productive discussions with the FDA and plan to meet with the agency in the near term. We are being thorough and deliberate in updating our file and we hope to have it to the FDA as soon as it is ready. We look forward to a successful submission and it's optimal approval."

67.     On August 8, 2019, the Individual Defendants caused the Company to issue a press release announcing the Company's Q2 2019 financial results. Specifically, the press release stated:

"We've made significant progress on our pipeline in the last few months," said Joe Turgeon, President and CEO of Spectrum Pharmaceuticals. "Most notably, we completed enrollment in our first two poziotinib cohorts in the ZENITH20 study and expect to see results from cohort 1 in the fourth quarter. Based on strong science, we've expanded the poziotinib development program to include additional areas of high unmet medical need in lung cancer. We also had a productive meeting with the FDA and expect to submit the ROLONTIS BLA in the fourth quarter."

\*     \*     \*

**ROLONTIS® (eflapegrastim), a novel long-acting GCSF:**

• Integrated data from both Phase 3 ROLONTIS clinical trials with 643 patients were presented in a poster session at American Society of Clinical Oncology 2019 annual meeting.

o The analysis found that integrated efficacy and safety data from the two identically designed Phase 3 trials - ADVANCE and RECOVER - were consistent with results from the individual trials, demonstrating that ROLONTIS was non-inferior to pegfilgrastim in the reduction of duration of severe neutropenia (DSN) in all four cycles of treatment.

• Spectrum met with the FDA and expects to submit the ROLONTIS BLA in the fourth quarter of 2019.

68.     On that same day, the Company held a conference call with investors and analysts, during which defendant Turgeon stated:

> Regarding ROLONTIS, our late stage asset to use in chemotherapy-induced neutropenia, we recently had a productive meeting with the FDA and plan to submit the BLA in the fourth quarter. I want to remind you that we have very strong efficacy and safety data coming out of two large Phase III trials. If approved, this product will compete in a multibillion dollar market that I and many members of our management team have a deep expertise in. We look forward to successful submission and its ultimate approval.

69.     During the conference call, defendant Lebel also added:

> Now, shifting to ROLONTIS, at ASCO, we presented a poster integrating the data from both of our pivotal phase three ROLONTIS clinical trials, which included a total of 643 patients. The integrated analysis of efficiency and safety was consistent with results from the individual studies demonstrating that ROLONTIS was non-inferior to pegfilgrastim in the reduction of duration of severe neutropenia. Regarding our BLA file, we recently had a productive meeting with the FDA to further discuss their expectation around module three, which is the module focused on manufacturing. Based on the outcome of that meeting, we expect to submit the BLA in the fourth quarter of this year.

70.     Further, during the same call, in response to a question regarding ROLONTIS BLA, defendant Turgeon responded that "[l]isten, we are aligned with the FDA. We had our meeting, we got aligned. We're being thorough, we're being deliberate and we're going to filing in the fourth quarter as we said. The questions that we had answered, we're in module three, which is in the SCMC section only. And again, we're being like I said, thorough and deliberate and plan on filing this in the fourth quarter."

71.     On October 24, 2019, the Individual Defendants caused the Company to issue a press release to announce Spectrum's submission of an updated ROLONTIS BLA with the FDA, stating:

> The BLA for ROLONTIS is supported by data from two identically designed Phase 3 clinical trials, ADVANCE and RECOVER, which evaluated the safety and efficacy of ROLONTIS in 643 early-stage breast cancer patients for the treatment of neutropenia due to myelosuppressive chemotherapy. In both studies, ROLONTIS demonstrated the pre-specified hypothesis of non-inferiority (NI) in Duration of Severe Neutropenia (DSN) and a similar safety profile to pegfilgrastim. ROLONTIS also demonstrated non-inferiority to pegfilgrastim in the DSN across all 4 cycles (all NI p<0.0001) in both studies.
>
> "We have submitted a robust package to the FDA that incorporates strong clinical data and addresses previously communicated FDA requests relating to manufacturing processes," said Joe Turgeon, President and CEO of Spectrum. "ROLONTIS could be the first novel G-CSF available to healthcare providers in

over 15 years and, if approved, we are looking forward to competing in this multibillion-dollar market."

In March 2019, Spectrum voluntarily withdrew the ROLONTIS BLA that it filed with the FDA in 2018. The updated BLA filed today includes additional information in the Chemistry, Manufacturing and Controls (CMC) section.

72.    On November 7, 2019, the Individual Defendants issued a press release announcing Spectrum's Q3 2019 financial results, which stated:

Spectrum has an expanding pipeline, significant near-term milestones, solid capitalization and a highly focused team," said Joe Turgeon, President and CEO, Spectrum Pharmaceuticals. "In December, we look forward to results from Cohort 1 of our ZENITH20 study investigating poziotinib in lung cancer patients with hard-to-treat mutations. We recently submitted our BLA for ROLONTIS to the FDA, a key milestone, as we continue to execute on our strategic priorities.

73.    On that same day, the Company hosted a conference call with investors and analysts, during which defendant Turgeon stated:

ROLONTIS is our late-stage drug being developed for the treatment of chemotherapy-induced neutropenia. As you recall, we voluntarily withdrew our BLA application earlier this year. Since then, we worked closely with the FDA and recently submitted a robust package. We look forward to competing in this market.

74.    On the same call, defendant Lebel added:

Now shifting to ROLONTIS. ROLONTIS is a novel long-acting GCSF seeking an indication for the treatment of neutropenia in patient receiving myelosuppressive cancer therapy. On October 24, we submitted an expanded BLA to the FDA. The withdrawal 7 months ago was driven by Module 3 or the CMC section. Since then, we've had productive dialogue with the FDA. We implemented their guidance, provided additional data and rewrote and reorganized certain sections of the file resulting in a strong submission.

As a reminder, our BLA is based on robust clinical data from 2 large pivotal, independent, randomized controlled trials. In both studies, ROLONTIS met the pre-specified end point of non-inferiority in duration of severe neutropenia and met all secondary end points. The safety profile was similar to pegfilgrastim.

75.    On December 26, 2019, the Individual Defendants caused the Company to issue a press release discussing the Company's late stage programs, which stated:

The company also announced today that the FDA has accepted for review the BLA for ROLONTIS for the treatment of chemotherapy-induced neutropenia. The [Prescription Drug User Fee Act] target action date for the ROLONTIS BLA has been set for October 24, 2020.

"If approved, ROLONTIS could be the first novel granulocyte colony-stimulating factor (G-CSF)" available to healthcare providers in over 15 years," said Joe Turgeon. "We have confidence in the future of ROLONTIS and are looking forward to potentially competing in this multibillion-dollar market."

The BLA for ROLONTIS is supported by data from two successful large pivotal Phase 3 clinical trials, ADVANCE (conducted under a SPA) and RECOVER. These trials evaluated the safety and efficacy of ROLONTIS in a total of 643 early-stage breast cancer patients for the treatment of neutropenia due to myelosuppressive chemotherapy. In both trials, ROLONTIS demonstrated the pre-specified hypothesis of non-inferiority (NI) in duration of severe neutropenia (DSN) and a similar safety profile to pegfilgrastim. ROLONTIS also demonstrated non-inferiority (NI) to pegfilgrastim in the DSN across all 4 cycles of chemotherapy (all NI p<0.0001) in both trials.

76.     On February 27, 2020, the Individual Defendants caused the Company to issue a press release announcing Q4 and full year 2019 financial results, which stated:

ROLONTIS is in active review by the FDA and we are preparing to launch shortly following approval," said Joe Turgeon, President and CEO, Spectrum Pharmaceuticals. "We believe this market represents a significant commercial opportunity and our prelaunch activities are well underway. We have a podium presentation on poziotinib in a few short weeks, we have taken steps to adjust our strategy and we have multiple data catalysts in 2020. I look forward to updating you on our progress throughout the year."

77.     On that same day, the Company held a conference call with investors and analysts, during which defendant Turgeon stated:

ROLONTIS is our late stage drug being developed for the treatment of chemotherapy-induced neutropenia. We submitted our BLA in October of 2019 and it was accepted for filing with the PDUFA date of October 22, 2020. If approved, ROLONTIS could be the first novel granulocyte-colony stimulating factor available to healthcare providers in over 15 years. We have confidence in the future of ROLONTIS and are looking forward to potentially competing in this multibillion dollar market.

78.     On March 2, 2020, the Individual Defendants caused the Company to file a Form 10-K with the SEC (the "2019 10-K"), which stated:

**ROLONTIS, a novel long-acting G-CSF:**

We submitted our updated BLA for ROLONTIS with the FDA on October 24, 2019 due to the FDA's request for additional information in the Chemistry, Manufacturing, and Controls section. The updated BLA was accepted by the FDA for review on December 20, 2019. Our BLA is supported by data from two identically designed Phase 3 clinical trials, ADVANCE and RECOVER, which evaluated the safety and efficacy of ROLONTIS in 643 early-stage breast cancer patients for the treatment of neutropenia due to myelosuppressive chemotherapy. Our PDUFA date for the potential approval of ROLONTIS by the FDA has been set for October 24, 2020.

In October 2019, integrated results from ADVANCE and RECOVER were presented during a poster session at the 2019 Meeting of the American Society of Clinical Oncology (ASCO) Symposium in San Francisco. The integrated efficacy and safety data from both trials were consistent with results from the individual trials, demonstrating that ROLONTIS was non-inferior to pegfilgrastim in the

reduction of duration of severe neutropenia in all four cycles of treatment. The integrated data also demonstrated that eflapegrastim provided an absolute risk reduction of severe neutropenia of 6.5% compared to pegfilgrastim in Cycle 1.

79.     The 2019 10-K was signed by defendants Turgeon, Gustafson, Ashton, Vyas, Welles, Czerepak, Cohen, and Vacirca.

80.     The 2019 10-K also included a certification from defendants Turgeon and Gustafson that the information contained in the 2019 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company pursuant to Section 302 SOX, which was substantially similar to the certification attached to 2018 10-K.

81.     On April 30, 2020, the Individual Defendants caused the Company to issue a press release titled, "Spectrum Pharmaceuticals Initiates Same Day Dosing Clinical Trial for ROLONTIS® (eflapegrastim), which stated:

Spectrum [. . .] today announced dosing of the first patient in a clinical trial to evaluate the administration of ROLONTISon the same day as chemotherapy. The trial will evaluate the duration of severe neutropenia when administered at three different time points on the same day following standard chemotherapy in patients with early stage breast cancer. ROLONTISis an investigational drug not approved by the U.S. Food and Drug Administration (FDA) and the BLA is currently under active review by the agency for the treatment of chemotherapy induced neutropenia with a PDUFA date of October 24, 2020.

"This study exemplifies our commitment to unlocking the full potential of ROLONTIS, the first novel biologic positioned to enter the G-CSF market since 2001. A same day dosing option would be a unique and meaningful addition to the G-CSF category," said Joe Turgeon, President and CEO of Spectrum Pharmaceuticals. "We will continue to follow the science and explore ways to add value to patients and health care providers. The initiation of this study, despite the pandemic, highlights investigator's interest and our team's dedication."

82.     On May 7, 2020, the Individual Defendants caused the Company to issue a press release announcing financial results for Q1 2020, which stated:

"The progress in our development pipeline speaks to the investigator interest and the commitment of our team during these unprecedented times," said Joe Turgeon, President and CEO, Spectrum Pharmaceuticals. "The PDUFA date for ROLONTIS remains October 24, 2020 and our updated poziotinib strategy is well under way. We continue to drive the business forward and remain focused on achieving our milestones this year."

83.     On that same day, the Company hosted a conference call with investors and analysts, during which defendant Turgeon stated:

ROLONTIS is our late-stage drug product candidate that's currently under active review at the FDA for the treatment of chemotherapy-induced neutropenia with a PDUFA date of October 24, 2020. If approved, ROLONTIS could be the first novel granulocyte-colony stimulating factor available to healthcare providers in over 15 years. Our launch preparations for ROLONTIS are actively underway. As the PDUFA date approaches we have already put key leadership personnel in place and will accelerate our commercial build out as we approach the launch date.

We're planning to launch with a lean and effective commercial infrastructure to maximize the impact of ROLONTIS. We're closely monitoring the evolving market dynamics and believe that launching this novel asset will benefit patients, our customers and our shareholders. We're looking forward to its potential approval into competing in this multi-billion dollar growth factor market.

84.     Further, during the same call, in response to a question regarding the likelihood of the ROLANTIS Phase 3 clinical trials being accepted by the FDA, defendant Turgeon stated:

The two trials we have, number one, there are over 600 patients - 643 patients as I recall - to Phase 3. This is under a SPA, which is a special protocol assessment and what that means, George, is that we worked with the agency, the FDA to develop the actual protocol, which they agreed. We were in tandem with them. They agreed with the protocol. If you have seen the data on both separate Phase 3 or in a presentation of combining the two trials together, the results were outstanding. We hit all our primary and secondary endpoints. Actually, it's what's called a non-inferiority trial. In other words, all we had to demonstrate is we were non-inferior to the standard of care which is the drug that's on the market today, and we certainly did that. You can argue in the first cycle, we actually showed some superiority although it's a non-inferiority trial.

So we feel really good about the data that we've submitted. All I can tell you, it's under active review as we speak. The PDUFA date, which means the date of approval is October 24. That still stands despite the pandemic.

We're on active review and active work with the agency, so we're hoping that we can get an approval this year.

85.     On August 10, 2020, the Individual Defendants caused the Company to issue a press release announcing the Company's Q2 2020 results, which stated:

"The recently announced positive results from Cohort 2 are a meaningful development for patients with NSCLC HER2 exon 20 insertion mutations for which there is no approved therapy," said Joe Turgeon, President and CEO, Spectrum Pharmaceuticals. "We are in the process of requesting a pre-NDA meeting with the FDA and look forward to reviewing this data with the agency. In addition, the BLA for ROLONTIS is under active FDA review with a PDUFA date of October 24, 2020. We are in a strong capital position to fund our ongoing development and commercialization of our late stage assets."

86.     On that same day, the Company hosted a conference call with analysts and investors, during which defendant Turgeon stated:

ROLONTIS our most advanced program is under active review at the FDA for the treatment of chemotherapy-induced neutropenia with a PDUFA date of October 24, 2020. If approved, ROLONTIS could be the first novel granulocyte-colony stimulating factor available to healthcare providers in over 15 years.

As the PDUFA date approaches, our launch preparations for ROLONTIS are accelerating. I look forward to getting back into this market, an area I know well personally, and the potential of competing in this multi-billion dollar growth factor market.

\*     \*     \*

I think you can see from everyone's remarks that Spectrum continues to make outstanding progress on our pipeline and our commercial build-out in anticipation of potential approval and launch for ROLONTIS.

87.     On October 26, 2020, the Individual Defendants caused the Company to issue a press release announcing that the FDA was deferring its action on the ROLONTIS BLA. Specifically the press release stated:

Spectrum [. . .] today announced that an inspection of the Hanmi Bioplant in South Korea is required before the FDA can approve the company's Biologics License Application (BLA) for ROLONTIS. The FDA was unable to conduct an inspection during the current review cycle due to restrictions on travel related to the COVID-19 pandemic. Therefore, the FDA is deferring action on the application until an inspection can be completed. The company will continue to work actively with the FDA to define an approach for scheduling the required inspection. Spectrum has confirmed with the FDA that this is not a Complete Response Letter.

"We are actively working with the FDA to find a way to expedite the plant inspection," said Joe Turgeon, President and CEO, Spectrum Pharmaceuticals. "The manufacturing facility is ready for inspection and we are eager to assist the FDA in completing their assessment as soon as possible."

88.     On November 4, 2020, the Individual Defendants caused the Company to issue a press release announcing its Q3 2020 financial results, which stated:

"The third quarter was marked by significant progress in our drug development programs and a strengthened financial position," said Joe Turgeon, President and CEO, Spectrum Pharmaceuticals. "Our team is preparing for the upcoming pre-NDA meeting with the FDA for poziotinib and actively working to obtain an approval for ROLONTIS as soon as possible."

\*     \*     \*

ROLONTIS (eflapegrastim), a novel long-acting G-CSF

The FDA deferred its action on the BLA for ROLONTIS, due to an inability to inspect the Hanmi Bioplant in South Korea citing travel restrictions related to the COVID-19 pandemic.

27
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Spectrum has confirmed with the FDA that the deferral is not a Complete Response Letter (CRL). The company is actively working to find a way to expedite the plant inspection.

89.     On that same day, the Company hosted a conference call with investors and analysts, during which defendant Turgeon stated:

We have answered all the inquiries from the FDA, and we're not aware of any outstanding items other than the inspection. We will be prudent with our financial resources and have gated certain activities pending further feedback or action from the FDA. Regarding the ROLONTIS plant inspection, our partner Hanmi Pharmaceuticals is a well-established global biopharmaceutical player with a world-class manufacturing facility.

Hanmi is the second largest pharmaceutical company in Korea, behind only Samsung. They're prepared for the inspection and willing to be accommodative to the needs of the FDA as it strives to meet the regulatory obligations. They've been a great partner and are working in tandem which Spectrum to obtain an approval for ROLONTIS as soon as it is possible. I'm real confident in our ability to meet our corporate objectives in advance of programs with the aspiration of bringing new treatments to the patients with cancer, who needed it.

90.     During the same call, in response to a question regarding ROLANTIS manufacturing facility, defendant Lebel responded:

So, as we've indicated in my remark, and [defendant Turgeon's], the – look to our knowledge, right, we have received during the review of this file many questions, we believe that we've answered all of them. And that the FDA was satisfied. But of course, we don't know that until, you know, they approved this drug. To our knowledge, the only thing outstanding right now, is the inspection of our manufacturing, a main manufacturing plant.

91.     Defendant Turgeon also added during the call:

And I want to stress another thing, we are absolutely ready for this inspection. We are ready for a long time, we welcome it. Matter of fact, the third part of your question was the mock inspections, was it required? They're certainly not required by the agency. We do that to make sure we're ready. And I can tell you, we have Spectrum boots on the ground there, we have Hanmi, which I mentioned, is a world-class manufacturer with a world-class plant. Their people are ready, and we work very closely with them with these mock inspections.

And we have a third leg to the stool, we have outside experts, we've hired to run these, not only run these mock inspections, but also help the readiness. And these are people who have done this for a living. They do this – they know exactly what the FDA is looking for in an inspection. So, we feel we're ready. We welcome the inspection already, you know, we can't wait.

92.     Further as a response to a question regarding the Company's discussions with the FDA, defendant Turgeon stated:

They have the authority to do things. So, you know, like in anything else, you contact the agency, they have so much time to get back to you. Kind of that's all laid out. And then we you know, we certainly can have discussions on what's next, how can we work with you, we're willing to do whatever it takes. As [defendant Lebel] said, just yesterday, they issued, you can see movement on their part for the first time in this because this is new to them. And they issued the statement on moving forward. Europe's doing it, as you heard already.

So I think they're going to have to just start moving forward. And all I'll tell you is, we will do anything we can to, I'll use the word nudge them. You know, you have to do it properly, but we every right to talk to them, we're ready to go and try and figure out how to do this as quickly as possible.

93.    On March 16, 2021, the Individual Defendants caused the Company to issue a press release providing information on the ROLONTIS pre-approval inspection, which stated:

Spectrum [. . .] today announced that the U.S. Food and Drug Administration (FDA) has scheduled the pre-approval inspection at the ROLONTIS® (eflapegrastim) manufacturing site in May 2021. In October 2020, the company received notification from the agency that it would defer its decision on the BLA because an inspection of the Hanmi Bioplant in South Korea could not be conducted during the review cycle due to restrictions on travel related to the COVID-19 pandemic.

"I am thrilled that the FDA informed us that they will be conducting a pre-approval inspection of the ROLONTIS manufacturing facility in May," said Joe Turgeon, President and CEO of Spectrum Pharmaceuticals. "We believe the pre-approval inspection marks the final step in the ROLONTIS review process."

94.    On March 30, 2021, the Individual Defendants issued a press release announcing the Company's Q4 and full year 2020 results, which stated, "we are delighted that the FDA has scheduled the pre-approval inspection at the ROLONTIS manufacturing facility for May 2021. The company has made tremendous progress advancing our development programs and conducting our clinical trials, despite the challenges of the global pandemic. I am proud of our employees who demonstrated resiliency and creativity during these unprecedented times."

95.    On that same day, the Company hosted a conference call with analysts and investors, during which defendant Turgeon stated:

Regarding ROLONTIS, the FDA is scheduled to perform the pre-approval inspection of our manufacturing facility in May. As you may recall, FDA informed us last year that it was deferring action on the BLA due to their inability to inspect the Hanmi Bioplant in South Korea as a result of travel restrictions related to the COVID-19 pandemic.

Hanmi Pharmaceuticals is an experienced biopharmaceutical manufacturer with a world-class facility, and they are ready for this inspection. As a matter of fact, Hanmi has received recently approval for ROLONTIS in Korea, which further raises our confidence in their manufacturing readiness.

29
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

&#42;     &#42;     &#42;

I think you can see from everyone's remarks that Spectrum continues to make strong and steady progress on our pipeline. We look forward to the completion of the inspection of our ROLONTIS manufacturing facility.

96.     During the same call, defendant Lebel added:

Our BLA for ROLONTIS is supported by robust clinical data from two large randomized clinical trials. Regarding the deferred action on our ROLONTIS filing that Joe mentioned, we believe with that we have answered satisfactorily all questions from the FDA related to the review of the BLA, and we believe that the inspection represents the final step in the review process. We and our partner Hanmi are ready for the FDA preapproval planned inspection that has been scheduled for May.

&#42;     &#42;     &#42;

So let me start with -- let's just say that when we got the deferral as opposed to a complete response CRL that usually indicates that the FDA is, they are pausing their review and the only step left to our knowledge is the inspection.

We have had a lot of discussion with the FDA on all the other matters, and our understanding is that we have answered all their questions satisfactorily. So, we believe the inspection is fundamentally the last step.

As to the timing following an inspection assuming that there's no issues, roughly I think a little more than a month, probably[.]

97.     On March 31, 2021, the Individual Defendants caused the Company to file a Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K stated that:

**ROLONTIS, a novel long-acting G-CSF:**

We submitted our updated BLA for ROLONTIS to the FDA on October 24, 2019, which was accepted for review by the FDA on December 20, 2019. Our BLA is supported by data from two similarly designed Phase 3 clinical trials, ADVANCE and RECOVER, which evaluated the safety and efficacy of ROLONTIS in 643 early-stage breast cancer patients for the treatment of neutropenia due to myelosuppressive chemotherapy. On October 26, 2020, we announced that the FDA PDUFA target action date set for October 24, 2020 was deferred pending inspection of the Hanmi manufacturing facility in Korea due to COVID-19 related travel restrictions. In March 2021, the FDA scheduled the pre-approval inspection of the Hanmi manufacturing facility for May 2021.

98.     The 2020 10-K was signed by defendants Turgeon, Gustafson, Ashton, Vyas, Welles, Brennan, Fischer, and Vacirca.

99.     The 2020 10-K also included a certification from defendants Turgeon and Gustafson that the information contained in the 2020 10-K fairly presented, in all material respects,

the financial condition and results of operations of the Company pursuant to Section 302 SOX, which was substantially similar to the certification attached to 2018 10-K.

100.    On May 13, 2021, the Individual Defendants caused the Company to issue a press release announcing the Company's Q1 2021 results, which stated that "[w]e also look forward to the FDA's pre-approval inspection of the ROLONTIS manufacturing facility which has been scheduled for later this month," and "[t]he FDA's pre-approval inspection of the ROLONTIS manufacturing facility has been scheduled for later this month and pre-commercial preparation activities are underway."

101.    On that same day, the Company hosted a conference call with analysts and investors, during which defendant Turgeon stated:

> Now, regarding ROLONTIS, the FDA scheduled the pre-approval inspection of our manufacturing facility for later this month. We believe this inspection marks the final step in the approval process and that Hanmi's world class facility is ready for this inspection. We are making real progress on our two lead clinical programs with major catalysts expected in the coming months, including a launch and an NDA filing.
>
> *        *        *
>
> Spectrum continues to make strong and steady progress on our development pipeline. We look forward to the completion of the inspection of our ROLONTIS manufacturing facility, which is planned to begin shortly.

102.    During the same call defendant Lebel added:

> Now, let me shift to ROLONTIS. On the regulatory side, [Defendant Turgeon] has already updated you on the status of the pre-approval inspection and we remain confident that our preparation with our partner, Hanmi, should result in a positive outcome for this FDA plant inspection.
>
> *        *        *
>
> We're prepared for the inspection. We're looking forward to it. I can't give you an exact date, but I think the FDA would take a reasonable amount of time to get back to us once the inspection is done and we feel that's the last step. So without giving the exact time, I think it'll be a reasonable amount of time after the inspection is done.

103.    The statements referenced in ¶¶58-102 were materially false and misleading because: (i) the ROLONTIS manufacturing facility maintained deficient controls and/or procedures; (ii) the foregoing deficiencies decreased the likelihood that the FDA would approve

31
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1    the ROLONTIS BLA in its current form; (iii) Spectrum had therefore materially overstated the

2    ROLONTIS BLA's approval prospects; and (iv) as a result, the Company's public statements were

3    materially false and misleading at all relevant times.

4    **The Truth Emerges**

5        104.    On August 6, 2021, the Company issued a press release and announced receipt of

6    a CRL from the FDA regarding the ROLONTIS BLA, which stated:

7        The CRL cited deficiencies related to manufacturing and indicated that a
         reinspection of the Company's manufacturing facility will be necessary. The
8        company is seeking further clarification from the FDA and plans to meet with the
         agency as soon as possible.
9
         "We are disappointed with this outcome and look forward to fully understanding
10       the remediation timelines for the program," said Joe Turgeon, President and CEO
         of Spectrum Pharmaceuticals. "We continue to believe in ROLONTIS and plan to
11       diligently complete the regulatory process to bring ROLONTIS to market."

12       105.    With this revelation, the Company's stock price fell 21.54%, or $0.70 per share, to

13   close at $2.55 per share on August 6, 2021, wiping out more than $115 million in the Company's

14   market capitalization.

15   **The Proxy Defendants Issued a Materially False
     and Misleading Proxy Statement During the Relevant Period**
16

17       106.    In addition to the above false and misleading statements issued and/or caused to be

18   issued by the Individual Defendants, defendants Turgeon, Ashton, Brennan, Fischer, Vacirca,

19   Vyas, and Welles (the "Proxy Defendants") also caused the Company to issue a false and

20   misleading proxy statement during the Relevant Period. The Proxy Defendants drafted, approved,

21   reviewed, and/or signed a Form DEF14A before it was filed with the SEC and disseminated to

22   Spectrum's stockholders on April 21, 2021 (the "2021 Proxy"). The Proxy Defendants negligently

23   issued materially misleading statements in the 2021 Proxy. These proxy allegations are based

24   solely on negligence, they are not based on any allegations of recklessness or knowing conduct by

25   or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud.

26   Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to

27   any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related

28   claims.

107.    The 2021 Proxy sought stockholder votes to, among other things, elect the Proxy Defendants for a one-year term.

108.    In support of the Proxy Defendants' bid to reelect themselves, the Proxy Defendants highlighted their supposed oversight of the Company. In particular, the 2021 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Spectrum faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans.  The 2021 Proxy stated:

> The Board, as a whole, actively oversees the risk management of the Company. Enterprise risks—the specific financial, operational, business and strategic risks that the Company faces, whether internal or external—are identified and prioritized by the Board and management together, and then each specific risk is assigned to the full Board or a Board committee for oversight. The Board does not have a standing risk management committee, but administers this function directly, as well as through committees of the Board. For example, the Audit Committee assists the Board in its risk oversight function by reviewing and discussing with management its financial accounting and compliance matters, including risks associated with:

> •accounting, financial reporting, tax compliance, disclosure controls and internal controls over financial reporting;

> •legal matters that may have a material impact on the Company's financial statements or involve governmental investigation or allegations of fraud or breach of fiduciary duty; and

> •the ethics compliance program.

> *        *        *

> The Audit Committee of our Board is responsible for assisting our Board in fulfilling its oversight responsibilities regarding our financial accounting and reporting process, system of internal control, audit process, and process for monitoring compliance with laws and regulations. The Audit Committee operates pursuant to a written charter, a copy of which is posted on our website at *https://investor.sppirx.com/corporate-governance*. The Audit Committee met four times during fiscal 2020. All members of the Audit Committee are non-employee directors and satisfy the current NASDAQ Listing Rules and SEC requirements with respect to independence, financial literacy and experience.

> Our management has the primary responsibility for our consolidated financial statements as well as our financial reporting process, accounting principles and internal controls. Deloitte & Touche LLP, our independent registered public accounting firm in 2020, is responsible for performing an audit of our consolidated financial statements and expressing an opinion as to the conformity of such financial statements with generally accepted accounting principles.

> In this context, the Audit Committee has reviewed and discussed our audited consolidated financial statements as of and for the year ended December 31, 2020 with our management and our independent registered public accounting firm. The

Audit Committee has discussed with our independent registered public accounting firm the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board ("PCAOB") and the SEC. The Audit Committee has also received the written disclosures and the letter from the independent registered public accounting firm required by applicable requirements of the PCAOB (Rule 3526) regarding the independent accountants' communications with the Audit Committee concerning independence, and has discussed with the independent registered public accounting firm the accounting firm's independence.

Based on the foregoing, the Board of Directors has approved the inclusion of the audited consolidated financial statements in our Annual Report on Form 10-K for the fiscal year ended December 31, 2020.

109.    The 2021 Proxy thus assured stockholders that both the Individual Defendants and the Board was involved with Spectrum's business strategy, actively monitored the Company's risks and exposures, following good corporate governance practices, and acting in an ethical and legal manner. In reality, the Proxy Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in allowing the Company to misrepresent to investors regarding ROLONTIS BLA.

110.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect the Proxy Defendants.

## DAMAGES

111.    As a result of the Individual Defendants' wrongful conduct, Spectrum disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made. The improper statements have devastated Spectrum's credibility. The Company has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

112.    Furthermore, aside from ruining the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlement in the Securities Class Action.

113.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Spectrum's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

114.    Moreover, these actions have irreparably damaged Spectrum's corporate image and

goodwill. For at least the foreseeable future, Spectrum will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Spectrum's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS

115.   Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

116.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

117.   Plaintiff is an owner of Spectrum common stock and was an owner of Spectrum common stock at all times relevant hereto.

118.   Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

119.   As a result of the facts set forth herein, Plaintiff has not made any demand on the Spectrum Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

120.   At the time this action was commenced, the Board consisted of seven directors: defendants Ashton, Brennan, Fischer, Turgeon, Vacirca, Vyas, and Welles (the "Director Defendants"). All seven members of the Board are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**Demand is Futile as to the Director Defendants**
**Because they Each Face a Substantial Likelihood of Liability**

121.   The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the relevant time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements

1 were accurate.

2    122.   Indeed, each of the Director Defendants signed the 2019 10-K and the 2020 10-K.

3 Further, defendants Ashton, Turgeon, Vacirca, Vyas, and Welles also signed the 2018 10-K.

4    123.   Moreover, the Director Defendants, as directors owed a duty to, in good faith and

5 with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the

6 Company's internal controls were sufficiently robust and effective (and were being implemented

7 effectively), and to ensure that the Board's duties were being discharged in good faith and with

8 the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized

9 and/or caused the publication of the materially false and misleading statements discussed above

10 that caused the Company's stock to trade at artificially inflated prices.

11    124.   The Director Defendants conscious and knowing making or authorization of false

12 and misleading statements, failure to timely correct such statements, failure to take necessary and

13 appropriate steps to ensure that the Company's internal controls were sufficiently robust and

14 effective (and were being implemented effectively), failure to take necessary and appropriate steps

15 to ensure that the Board's duties were being discharged in good faith and with the required

16 diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the

17 Director Defendants face a substantial likelihood of liability. If the Director Defendants were to

18 bring a suit on behalf of Spectrum to recover damages sustained as a result of this misconduct,

19 they would expose themselves to significant liability. This is something they will not do. For this

20 reason demand is futile as to the Director Defendants.

21 **Defendant Turgeon Lacks Independence**

22    125.   Defendant Turgeon is not disinterested for purposes of demand futility because his

23 principal occupation is CEO and President of Spectrum. According to the Company's SEC filings,

24 in 2018, 2019, and 2020, Turgeon received total compensation of $4,722,227, $5,697,232, and

25 $3,713,218, respectively. These amounts are meaningful to defendant Turgeon. As such, Turgeon

26 could not independently consider any demand to sue himself for breaching his fiduciary duties to

27 the Company, because that would have exposed him to liability and threatened his livelihood.

28    126.   To that end, the 2021 Proxy admits that defendant Turgeon lacks independence due

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

to his positions with the Company.

127.    Defendant Turgeon is also incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

**Demand is Futile as to Defendants Ashton, Brennan, Fischer, and Welles Because as Members of the Audit Committee They Face a Substantial Likelihood of Liability**

128.    Defendants Ashton, Brennan, Fischer, and Welles, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements, and allowed the Individual Defendants to repeatedly make false and misleading statements to the investing public. More specifically, as members of the Audit Committee, defendants Ashton, Brennan, Fischer, and Welles were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, Ashton, Brennan, Fischer, and Welles, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter. For this reason, demand is futile as to defendants Ashton, Brennan, Fischer, and Welles.

129.    As noted in the 2021 Proxy: "The Audit Committee of our Board is responsible for assisting our Board in fulfilling its oversight responsibilities regarding our financial accounting and reporting process, system of internal control, audit process, and process for monitoring compliance with laws and regulations."

130.    As such, defendants Ashton, Brennan, Fischer, and Welles were in a unique position to not only know about the Individual Defendants' false and misleading statements, but to also prevent them. Defendants Ashton, Brennan, Fischer, and Welles failed to do so, leaving them each facing a substantial likelihood of liability.

131.    Defendants Ashton, Brennan, Fischer, and Welles breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other

disclosures and,otherwise failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. Therefore, defendants Ashton, Brennan, Fischer, and Welles face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## COUNT I

### AGAINST DEFENDANTS TURGEON, GUSTAFSON, AND LEBEL FOR FEDERAL CONTRIBUTION AND INDEMNIFICATION PURSUANT TO SECTION 10(B) AND 21D OF THE EXCHANGE ACT

132.    Plaintiff incorporates by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

133.    This claim is brought derivatively on behalf of the Company against defendants Turgeon, Gustafson, and Lebel for contribution and indemnification.

134.    Defendants Turgeon, Gustafson, and Lebel herein have been named as defendants in the Securities Class Action, as alleged herein.

135.    Defendants Turgeon, Gustafson, and Lebel had a duty not to defraud the investing public by the dissemination of materially false and misleading statements.

136.    Although Plaintiff does not adopt the allegations of wrongdoing that are alleged in the Securities Class Action as its own, if the Company is deemed to have violated the federal securities laws, and incurs damages therefore, such damages should not be disproportionately borne by the Company, and defendants Turgeon, Gustafson, and Lebel are liable to the Company for contribution and indemnification.

137.    Accordingly, Plaintiff asserts this claim derivatively for contribution and indemnification, as provided by federal statute.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

138.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

139.    The Individual Defendants owed and owe Spectrum fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Spectrum the

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

140.    All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

141.    Each of the Individual Defendants had actual or constructive knowledge that violated their duty of good faith by knowingly causing and/or recklessly allowing the Company to make false and misleading statements and/or fail to disclose that: (i) the ROLONTIS manufacturing facility maintained deficient controls and/or procedures; (ii) the foregoing deficiencies decreased the likelihood that the FDA would approve the ROLONTIS BLA in its current form; (iii) Spectrum had therefore materially overstated the ROLONTIS BLA's approval prospects; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

142.    The Individual Defendants also caused or allowed Spectrum to lack requisite internal controls, and, as a result, the Company regularly made false and misleading statements regarding Spectrum's financial condition and future financial growth.

143.    The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

144.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Spectrum has sustained significant damages.

145.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

146.    Plaintiff, on behalf of Spectrum, has no adequate remedy at law.

## COUNT III

### AGAINST THE PROXY DEFENDANTS FOR VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT

147.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

of the Proxy Defendants. The Section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

149.     The Proxy Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2021 Proxy. In the 2021 Proxy, the Board solicited stockholder votes to reelect the certain of the Individual Defendants to the Board.

150.     The 2021 Proxy, however, misrepresented and failed to disclose, among others, the Board's risk oversight and the Company's inadequate internal controls which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Proxy Defendants violated Section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Spectrum misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect Turgeon, Ashton, Brennan, Fischer, Vacirca, Vyas, and Welles.

151.     Plaintiff, on behalf of Spectrum, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2021 Proxy in connection with the improper reelection of the Proxy Defendants.

## <u>COUNT VI</u>

### AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

152.     Plaintiff incorporates by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

153.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Spectrum in the form of salaries, bonuses, and other forms of compensation.

154.     Plaintiff, as a stockholder and representative of Spectrum, seek restitution from the Individual Defendants, and each of them, and seek an order of this Court disgorging all profits,

benefits, and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

B.      Finding Defendants liable for breaching their fiduciary duties owed to the Company;

C.      Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

D.      Awarding damages to the Company for the harm the Company suffered as a result of the Defendants' wrongful conduct;

E.      Awarding damages to the Company for defendants Turgeon's, Gustafson's, and Lebel's violations of Sections 10(b) and 21D of the Exchange Act;

F.      Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

G.      Awarding such other and further relief as is just and equitable

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

## **JURY TRIAL DEMANDED**

2

Plaintiff hereby demands a trial by jury on all issues so triable.

3

4     Dated: December 15, 2021

5                                                      Respectfully Submitted,

6                                                      __*s/ Martin A. Muckleroy*____
7                                                      MARTIN A. MUCKLEROY, ESQ.
Nevada Bar No. 009634
8                                                      **MUCKLEROY LUNT, LLC**
6077 S. Fort Apache, Ste. 140
9                                                      Las Vegas, NV 89148
Phone: (702) 907-0097
10                                                     Fax: (702) 938-4065

11

12                                                     *Attorneys for Plaintiff*

13                                                     *OF COUNSEL:*

14                                                     **BRAGAR EAGEL & SQUIRE, P.C.**
Garam Choe
15                                                     810 Seventh Avenue
Suite 620
16                                                     New York, New York 10019
Telephone: (212) 355-4648
17

18

19

20

21

22

23

24

25

26

27

28

42
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT